UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

EVELYN G. INGRAM,                        CIVIL ACTION
             Appellant                   NO. CV07-0414-A

VERSUS

MICHAEL ASTRUE, COMMISSIONER             JUDGE DEE D. DRELL
OF SOCIAL SECURITY,                      MAGISTRATE JUDGE JAMES D. KIRK
             Appellee


REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Evelyn G. Ingram ("Ingram") filed an application for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on January 26, 2005 (Tr. pp. 67, 314), alleging a disability onset date of February 1, 2004, due to lupus, heart problems, and liver problems (Tr. p. 100). Those claims were denied by the Social Security Administration ("SSA") (Tr. pp. 28-29).

A de novo hearing was held before an administrative law judge ("ALJ") on April 25, 2006, at which Ingram appeared with her attorney, a vocational expert ("VE"), and a medical expert (Tr. p. 378). The ALJ found that Ingram met the disability insured status requirements through June 30, 2004, and that, although she suffers from "severe"[1] hypertension, hypothyroidism, hepatitis C, lupus,

---

[1] An impairment can be considered as not "severe" only if it is a slight abnormality which has such a minimal effect on the claimant that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience. Estran v. Heckler, 745 F. 2d 340, 341 (5th Cir. 1984). See also, Anthony v. Sullivan, 954 F.2d 289 (5th Cir. 1992).

obesity, chronic obstructive pulmonary disease, and osteoarthritis of the right knee, she has the residual functional capacity to perform light work except for work involving climbing ladders, ropes, or scaffolds, heights, or extremes of temperature or humidity, and with only limited exposure to dust and fumes (Tr. pp. 18-19). The ALJ further found there are jobs existing in significant numbers in the national economy which Ingram can perform, such as cashier, ticket taker, small parts assembler, and hand packager (Tr. p. 23). The ALJ concluded that Ingram was not under a disability as defined in the Social Security Act at any time through the date of the ALJ's decision on July 26, 2006 (Tr. pp. 23-24).

Ingram requested a review of the ALJ's decision, but the Appeals Council declined to review it (Tr. p. 5), and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Ingram next filed this appeal for judicial review of the Commissioner's final decision. The sole issue Ingram presented for review is whether the ALJ failed to properly evaluate the severity of all of her medically determined impairments, resulting in flawed findings at Steps 3 through 5. Ingram's appeal is now before the court for consideration.

## Eligibility for Benefits

To qualify for SSI benefits, a claimant must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. 1381(a). Eligibility is dependent upon disability,

income, and other financial resources. 42 U.S.C. 1382(a). To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than 12 months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 42 U.S.C. 1382(a)(3).

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. 416(I), 423. Establishment of a disability is contingent upon two findings. First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. 423 (d)(1)(A). Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. 423(d)(2).

<u>Scope of Review</u>

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. <u>McQueen v. Apfel</u>, 168

F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 482 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981). Also, Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. Dellolio, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988);

4

Dellolio, 705 F.2d at 125.

## ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether Ingram (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled. Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Ingram had not engaged in substantial gainful activity prior to her alleged disability

5

onset date of February 1, 2004 (Tr. p. 18), that her disability insured status expired after June 30, 2004, and that she has severe impairments of hypertension, hypothyroidism, hepatitis C, lupus, obesity, chronic obstructive pulmonary disease, and osteoarthritis of the right knee, but does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. p. 19). The ALJ also found that Ingram is unable to perform her past relevant work as a cook or a store laborer (Tr. p. 22).

At Step No. 5 of the sequential process, the ALJ further found that Ingram has the residual functional capacity to perform light work except for work involving climbing ladders, ropes, or scaffolds, heights, or extremes of temperature or humidity, and can have only limited exposure to dust and fumes (Tr. pp. 18-19). The ALJ found that the Ingram was, at the time of her decision, closely approaching advanced age, with at least a high school education, and that transferability of her work skills was irrelevant (Tr. p. 22). The ALJ concluded found there are jobs existing in significant numbers in the national economy which Ingram can perform, such as cashier, ticket taker, small parts assembler, and hand packager (Tr. p. 23) and, therefore, Ingram was not under a "disability" as defined in the Social Security Act at any time through the date of the ALJ's decision on July 26, 2006.

<u>Summary of Pertinent Facts</u>

Ingram was 49 years old at the time of her April 2006 administrative hearing (Tr. p. 382), had a high school education

plus a vo-tech course (Tr. p. 384), and had past relevant work experience as a cook and a store laborer (Tr. pp. 83-89). Ingram has not worked since February 2003 (Tr. p. 141).

Ingram was diagnosed with hepatitis C in January 2005 (Tr. pp. 111, 116). Ingram was also diagnosed with hypertension (Tr. p. 118) for which she was prescribed Clonidine (Tr. p. 134), and depression, for which she was given Paxil (Tr. p. 136). Ingram underwent a consultative examination in March 2005, which showed she was obese at 5'4" tall and 237 pounds, had high blood pressure, had a right limp but a neurologically intact gait and a normal x-ray of the right knee joint, and suffers from systemic lupus erythematosus and hepatitis C (Tr. pp. 141-142). Ingram's visual acuity was $20/100^2$ in each eye with correction (Tr. p. 141) Ingram admitted that she smokes twelve cigarettes a day (Tr. p. 141). In April 2004, Ingram's pulmonary function studies showed an $FEV_1/FVE$ of 80 percent, with values in excess of $1.25^3$ (Tr. p. 143).

A test for lupus in March 2005 was negative (Tr. pp. 270-279).

In April 2005, Ingram sprained her right knee and was prescribed crutches and physical therapy (Tr. pp. 220, 226-230). X-rays in May 2005 showed degenerative arthritis of the knee and obesity (Tr. p. 283). She continued to have pain and swelling in her knee in September 2005 (Tr. pp. 220).

---

[2] The medical report appears to have been incorrectly transcribed as "2100" (for 20 - 100) instead of "20/100" (Tr. p. 141).

[3] The maximum value assigned to someone of 5'4" tall in order to meet Listing 3.02 of Appendix 1.

In July 2005, Ingram suffered acute chest pain (Tr. p. 161).
Congestive heart failure was ruled out and the cause was believed
to be gastrointestinal (Tr. pp. 162-167). In October 2005, Ingram
was diagnosed at the LSU Health Services Center in Shreveport with
Hashimoto thyroiditis[4] and hypothyroidism, and was prescribed
Synthroid[5] (Tr. pp. 204-205).

In March 2006, Ingram again complained of chest pain and was
diagnosed with gallstones and was instructed to follow up with ths
surgery clinic (Tr. pp. 301-312, 320-324, 336).

Finally, in October 2006, Ingram's evaluation of chronic
pulmonary obstructive disease showed the values of most $FEV_1$
measurements were less than 1.25 (the maximum value assigned to
someone of 5'4" tall in order to meet Listing 3.02) (Tr. p. 369);
at that time, her weight was 232 pounds and she had been smoking
for 35 years (Tr. p. 369).

At her administrative hearing in April 2006, Ingram testified
that she was "coughing up a lot of blood" due to her chronic

---

[4] Also known as chronic thyroiditis, a common thyroid gland
disorder caused by a reaction of the immune system against the
thyroid gland. It may cause a thyroid hormone deficiency
(hypothyroidism) that can be treated with thyroid replacement
therapy. MEDLINEplus Health Information, Medical Encylopedia:
Chronic thyroiditis (Hashimoto's disease), *available at*
http://www.nlm.nih.gov/medlineplus/encyclopedia.html (a service
of the U.S. National Library of Medicine and the National
Institutes of Health).

[5] Synthroid (also known as levothyroxine) is a thyroid
hormone used to treat hypothyroidism. MEDLINEplus Health
Information, Drug Information: Synthroid (Levothyroxine),
*available at* http://www.nlm.nih.gov/medlineplus/druginfo/
medmaster (a service of the U.S. National Library of Medicine and
the National Institutes of Health).

obstructive pulmonary disease (Tr. p. 385). Ingram also testified she has hypertension and mitral valve prolapse (Tr. p. 386), and takes Paxil for depression although she does not see a psychologist (Tr. p. 386).

Ingram further testified that her last job was working as a cook (Tr. pp. 384-385). She stopped working because she could no longer pick up heavy pots and pans (Tr. p. 387).

Ingram testified she normally gets up at 4:00 or 4:30 a.m. (Tr. p. 387), she may sleep some during the day, and does not have a regular bedtime at night (Tr. p. 388). Ingram testified she does not cook, clean, or do laundry (her daughter does that for her), does not help tend her grandchild, does not grocery shop, cannot lift a gallon of milk, does not drive, and does not have any hobbies, but she does bathe and dress herself, watch TV, and go to church (Tr. pp. 388-389). Ingram testified she cannot work because she cannot breathe, cannot lift more than a couple of pounds with both hands, and cannot stand very long or walk very far (Tr. p. 389). Ingram testified her medications help and the only side effect is a little sleepiness (Tr. p. 390). Ingram also has trouble reading due to impaired vision, even with her glasses (Tr. pp. 396-397). Ingram testified she is trying to quit smoking but still smokes five or six cigarettes every morning; she does not drink alcohol (Tr. p. 390).

Ingram also testified that spices and colognes cause difficulty breathing, so she is unable to do secretarial work, and she cannot breathe if she walks very far (Tr. p. 392). Ingram

testified she is planning to start interferon treatment for her hepatitis C, after she has a liver biopsy (Tr. pp. 392-393). Ingram testified her interferon treatment will consist of one shot once a week for 48 weeks, and she will in an assisted living facility during the treatment (Tr. p. 393).

Ingram further testified that when she picks up anything heavy or grasps anything tightly, the skin on her hands cracks and bleeds; she also suffers from pain and swelling in the joints in her hands, neck, right shoulder and knees (Tr. pp. 393-395). Ingram testified that, although she was treated for lupus since 1990, her physicians later discovered she does not actually have lupus (Tr. p. 395).  Ingram also suffers from hypothyroidism, which makes her tired during the day (Tr. p. 396).

The medical expert, Dr. George Smith, summarized Ingram's health problems as hypertension under treatment (without end organ disease), hypothyroidism due to Hashimoto's thyroiditis (an autoimmune disease), hepatitis C, a planned liver biopsy to determine the activity of the hepatitis C, planned Interferon treatments for 48 weeks, and chronic obstructive pulmonary disease ("COPD") (Tr. pp. 398-399).  Dr. Smith noted that Ingram's COPD seemed to be reactive to allergens and exertion, but that her earlier pulmonary function studies were not very bad, so it appeared to be a chronic problem with acute exacerbations (Tr. pp. 398-399).  Dr. Smith stated that Ingram's long term problem was hepatitis C because she had a high viral load (over five million at last count), and because some people have difficulty with or are

not able to tolerate Interferon treatment (Tr. pp. 398-399).
Ingram weighed 201 at the time of her administrative hearing, and
attributed her weight loss to her illness (Tr. pp. 382-383). Dr.
Smith noted that Ingram has a smoker's cough and stated that, if
her latest pulmonary function studies showed deterioration, she may
meet a listing for COPD (Tr. pp. 400-401).

The VE testified that Ingram's past work as a stock clerk at
Wal-Mart was unskilled, medium level work, and Ingram's work as a
cook was skilled, medium level work (Tr. p. 404). In response to
a hypothetical question involving a person of Ingram's age,
education, and work history, who is limited to light level work
with no work at heights or using ladders and scaffolds, no exposure
to extremes in temperature or humidity, and limited exposure to
dust and fumes, the VE testified that such a person could work as
a cashier (light duty - 19000 jobs in Louisiana, 300,000 jobs in
the U.S.), ticket taker (8200 jobs in the U.S., 100 in Louisiana),
small parts assembler (900 jobs in Louisiana, 164,000 in the U.S.)
(Tr. pp. 405-406), or hand packager (208,000 jobs in the U.S., 800
jobs in Louisiana).

In response to a second hypothetical question involving a
person of Ingram's age, education, and work history, who is limited
to sedentary level work with no work at heights, no use of ladders
or scaffolds, a limited ability to handle fine objects, no exposure
to extremes in temperatures, no exposure to dust and fumes, the VE
testified that such a person would not be able to perform any jobs
which are available in significant numbers in the national or

11

regional economies (Tr. p. 407). The VE explained that the limited ability to handle fine objects was the factor which precluded sedentary level work, since it would necessarily involve continuous use of the hands (Tr. p. 407).

In response to a third hypothetical question involving a person of Ingram's age, education, and work history, who is limited to the extent described by Ingram in her testimony, the VE testified that such a person would not be able to perform any work existing in significant numbers in the national or regional economies (Tr. pp. 407-408). The VE explained the main factors precluding work were Ingram's stated inability to lift more than two pounds, limited ability to walk, her shortness of breath on exertion, vision problems, and problems with her hand joints and gripping (Tr. p. 408).

## Law and Analysis

Ingram contends the ALJ failed to properly evaluate the severity of all of her medically determined impairments, resulting in flawed findings at Steps 3 through 5. Specifically, Ingram claims the ALJ erred in failing to consider her (1) severe vision impairment (20/100 in both eyes with correction), (2) obesity, and (3) COPD (as reflected in the October 2006 pulmonary function study) when determining she did not meet the listings, and in (4) finding she has the residual functional capacity to perform light work, and (5) finding she can work as a small parts assembler or hand packager.

12

## 1. Vision Impairment

Ingram has a visual acuity with correction (glasses) of 20/100 in each eye (Tr. pp. 141-142). The ALJ noted this visual acuity measurement by Dr. Tillman, then stated "claimant was not wearing glasses at the hearing and has not submitted documentation of a severe vision impairment," finding Dr. Tillman's visual acuity test "insufficient to document a severe vision impairment" and concluding Ingram's vision impairment was no more that a "slight abnormality" that would not impact her ability to work (Tr. p. 19).

As Ingram contends, the ALJ cannot substitute her non-expert opinion for uncontradicted medical evidence. ALJ's have been warned by the courts against "playing doctor" and making their own independent medical assessments. Frank v. Barnhart, 326 F.3d 618 (5th Cir. 2002). Also, Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir. 1990), cert. den., 502 U.S. 901, 112 S.Ct. 278 (1991). In this case, the ALJ inappropriately substituted her "opinion" for Dr. Tillman's uncontroverted medical findings when she concluded that Ingram did not provide evidence to show she had a severe vision impairment. In fact, Table 1 of Rule 2.00 of Appendix I shows that corrected vision of 20/100 is only a 50 percent visual acuity efficiency. A loss of 50 percent of visual acuity *with* correction is not a non-severe impairment.

To the extent the Commissioner argues that Dr. Tillman (an internist and pulmonary specialist) is not an optometrist or ophthalmologist, it is noted that Dr. Tillman was appointed to evaluate Ingram by Disability Determinations on behalf of the

Commissioner; he was not Ingram's choice of physician. Moreover, if the ALJ was in doubt as to Dr. Tillman's medical opinion in this matter, Ingram should have been sent to a vision specialist. The ALJ was not qualified to simply substitute her opinion for or disregard Dr. Tillman's medical findings. Finally, the regulations do not require any "diagnostic criteria" to establish a loss of vision acuity other than the measurement of Ingram's vision.

Therefore, substantial evidence does not support the ALJ's finding that Ingram's vision impairment is "non-severe." This case should be remanded to the Commissioner for a determination, based on medical evidence, of the effect Ingram's vision impairment has on her residual functional capacity for work.

2. Obesity

Next, Ingram contends the ALJ erred in failing to consider the effect of her obesity on her residual functional capacity.

Obesity should be considered in combination with other impairments in making the residual functional capacity determination and in discussing the claimant's ability to perform sustained work activities. Beck v. Barnhart, 205 Fed.Appx. 207, 212 (5th Cir. 2006), citing SSR 02-1p. As stated in Ingram's May 2005 residual functional capacity assessment by a non-examining physician, Ingram's BMI (body mass index) was 40+ at 239 pounds (Tr. p. 141), which accounted for most of her restriction in functioning (Tr. p. 155). At the time of her April 2006 administrative hearing, Ingram weight 201 pounds (Tr. p. 382), so

14

her BMI was 34.5.[6]

The ALJ did not specifically discuss the impact of Ingram's obesity on her ability to work, but recognized that Ingram suffers from obesity and discussed the cumulative effects of her impairments, including obesity, on her residual functional capacity (Tr. p. 21). Obesity is not a listed impairment, although it can reduce an individual's occupational base for work activity in combination with other ailments. Beck, 205 Fed.Appx. at 211, citing SSR 02-1p, "Evaluation of Obesity."[7]

In the case at bar, the ALJ implicitly considered the effects of Ingram's obesity in conjunction with consideration of the effects of her other impairments on her ability to work. Moreover, the ALJ discussed the arthritis and pain in Ingram's right knee, finding that her knee sprain had resolved, so she was able to stand and walk enough to perform light work activity. Therefore, the ALJ

---

[6] A body-mass index calculator is provided by the National Heart, Lung, and Blood Institute, Department of Health and Human Services, National Institutes of Health at http://www.nhlbisupport.com/bmi/.

[7] "Obesity" is a term used to describe body weight that is much greater than that which is considered healthy. Adults with a BMI greater than 30 are considered obese. Anyone more than 100 pounds overweight or with a BMI greater than 40 is considered morbidly obese. Obesity is a significant health threat because the extra weight puts unusual stress on all parts of the body, and it increases the risk of diabetes, stroke, heart disease, kidney disease, gallbladder disease, high blood pressure, high cholesterol, some types of cancer, osteoarthritis, and sleep apnea. MEDLINEplus Health Information, Medical Encylopedia: Obesity, *available at* http://www.nlm.nih.gov/medlineplus/encyclopedia.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

did not disregard Ingram's obesity.[8]  This issue is meritless.

3. COPD

Next, Ingram contends the ALJ failed to consider the October 2006 pulmonary function study when determining she did not meet the listings in Appendix I for COPD.

If the claimant's condition is listed, or is medically equivalent to a listed impairment, the claimant is conclusively determined disabled.  Cieutat v. Bowen, 824 F.2d 348, 351 n.1 (5th Cir. 1987).  Also, Selders v. Sullivan, 914 F.2d 614, 619 n. 1 (5th Cir. 1990). A claimant has the burden of proving that his condition meets or equals an impairment listed in Appendix 1.  Sullivan v. Zebley, 493 U.S. 521, 110 S.Ct. 885, 891-92, 107 L. Ed. 2d 967 (1990).  See also, Selders v. Sullivan, 914 F. 2d 614, 619(5th Cir. 1990).  For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify.  Sullivan v. Zebley, 110 S. Ct. at 891.

Listing 3.02, for chronic pulmonary insufficiency, states in pertinent part: "A. Chronic obstructive pulmonary disease, due to any cause, with the FEV₁ equal to or less than the values specified in table I corresponding to the person's height without shoes." According to Table 1, for a person 5'4" (Ingram), the FEV₁ must be 1.25 or less.

---

[8] The ALJ's failure to mention a particular piece of evidence does not necessarily mean that he failed to consider it. Hammond v. Barnhart, 124 Fed.Appx. 847 (5th Cir. 2005).

Ingram's October 2006 pulmonary function study showed a pre-test $FEV_1$ of 1.07 and a post-test $FEV_1$ of .69, which was interpreted to indicate airway obstruction and severe obstructive airways disease (Tr. pp. 369-370).  Those $FEV_1$ results appear to meet Listing 3.02(A), since they are less than 1.25.

However, the October 2006 pulmonary function study was conducted after the ALJ's decision, and was submitted to the Appeals Council, which found no basis for changing the ALJ's decision (Tr. pp. 5-6).  Given the medical evidence discussed above, the Appeals Council appears to have erred in this respect.

Therefore, substantial evidence does not support the final decision of the Commissioner.  Ingram's case should be remanded to the Commissioner for consideration of whether she meets or equals Listing 3.02.[9]

## 4-5. Residual Functional Capacity and Specific Jobs

Ingram contends the ALJ erred in finding she has the residual functional capacity to perform light work, and in finding she can work as a small parts assembler or hand packager.

Since substantial evidence does not support the conclusions of the ALJ and the Appeals Council as to whether Ingram has a vision impairment and whether she meets or equals a listing for COPD, their finding that Ingram has the residual functional capacity to perform light work, and thus can perform certain light duty jobs,

---

[9] Since Ingram did not meet Listing 3.02 prior to the date her disability insured status expired on June 30, 2004, the conclusion that she did not qualify for DIB under the listings appears to be supported by substantial evidence.

is also not supported by substantial evidence.  However, this does not entitle Ingram to a decision in her favor based upon the existing record.  The record is simply inconclusive as to whether Ingram meets a listing and, if not, the exact nature of Ingram's residual function capacity and whether there are any jobs existing in significant numbers in the national economy which Ingram can perform, given her true impairments.

Therefore, Ingram's case should be remanded to the Commissioner for further proceedings.

### Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that the final decision of the Commissioner be REVERSED AND VACATED and that Ingram's case be REMANDED, pursuant to the sixth sentence of 42 U.S.C. § 405(g), to the Commissioner for further proceedings consistent with the views expressed herein.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **ten (10) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT**

WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.

THUS DONE AND SIGNED at Alexandria, Louisiana, on this ____ day of December, 2007.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE

19